SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

## State v. Dante C. Allen (A-55-21) (086699)

**Argued January 17, 2023 -- Decided August 2, 2023**

**PATTERSON, J., writing for the Court.**

In this appeal, the Court considers whether defendant Dante Allen was denied a fair trial because the trial court permitted a detective to present lay opinion testimony in which he narrated a video recording.

On November 4, 2015, defendant was speaking with a friend on the sidewalk. According to defendant's trial testimony, he was carrying a handgun that he had recently acquired after a confrontation with a gang member made him fear for his safety. Officer Terrence McGhee of the Asbury Park Police Department, who suspected defendant had a weapon based on his behavior when McGhee passed in a patrol car, approached defendant and asked to speak. According to McGhee, defendant ran into a vacant lot, turned around, raised his gun, and fired at McGhee, who was not hit. McGhee testified that he then fired at and wounded defendant. Defendant testified that he ran toward the back of an abandoned building "to throw the gun on the roof." According to defendant, he "tr[ied] to throw the gun on the . . . roof, but as I turned to the side, I could see [McGhee] out of my peripheral. So next thing on my mind is to bring the gun back in, but it's too late, I wasn't able to, the gun goes off." He stated that he never pointed the gun at McGhee. Defendant was arrested and taken to a hospital. Shortly thereafter, Detective Michael Campanella, the lead forensic detective in the case, arrived at the scene. He inspected the gun and reviewed two surveillance videos from nearby buildings.

During defendant's trial, Officer McGhee testified, in part narrating the videos as they were played for the jury. Campanella testified later, describing the steps taken in the investigation. After the State indicated its intent to replay the surveillance videos that the jury had already viewed during McGhee's testimony, defense counsel objected. The State countered that Campanella would explain how the video "led him [to find] evidence, such as the shell casings and the bullets." The trial court overruled the objection. As the videos were replayed, Campanella made references to the defendant firing or discharging the gun and turning toward the officer. The State also presented the expert testimony of Randolph Toth of the State Police Laboratory Ballistics Unit, who opined that the weapon had not discharged

1

accidentally the night of the incident. Defendant testified and denied that he had shot at McGhee or had any intent to injure the officer. He maintained that the gun discharged accidentally.

The jury convicted defendant of attempted murder and other offenses. The Appellate Division found that the trial court had abused its discretion when it permitted Campanella to narrate the surveillance video but held that the error was harmless and affirmed. The Court granted certification. 251 N.J. 33 (2022).

**HELD:** The Court disagrees with the Appellate Division's conclusion that the trial court should have excluded all the detective's narration of the surveillance video. The trial court properly permitted the detective to testify about the manner in which he used the surveillance video to guide his investigation. Applying principles stated today in State v. Watson, ___ N.J. ___ (2023) (slip op. at 46-60), the detective's testimony opining that the video showed defendant turning and firing his weapon should have been excluded from evidence. However, that error was harmless given the strength of the State's evidence.

1. The Court reviews N.J.R.E. 701, which governs the admission of lay opinion testimony, and recent decisions in which the Court has applied Rule 701 to an officer's testimony about a photo or video relating to an offense. In State v. Higgs, the Court barred the lay opinion of a law enforcement officer who was not present at a shooting and testified that an object depicted in a surveillance video appeared to be a firearm. 253 N.J. 333, 365-67 (2023). In Watson, the Court disapproved of portions of an officer's narration testimony reflecting his subjective belief of what occurred in a video, including observations about alleged efforts by the suspect not to touch surfaces during the robbery. ___ N.J. at ___ (slip op. at 58-59). But the Court held that in appropriate circumstances, the testimony of a witness who was not present when a video was recorded may satisfy the evidence rules. Id. at ___ (slip op. at 49-56). (pp. 16-21)

2. To convict defendant of attempted murder in this case, the State had to prove beyond a reasonable doubt that he intended to cause McGhee's death. It was the jury's province to decide whether defendant had purposely fired his gun at McGhee or was attempting to dispose of the gun when it accidentally discharged. Most of Campanella's testimony regarding the surveillance video pertained to the role of the video in the investigation of the crime scene. He explained how he used the video to identify areas that he considered likely to contain evidence relevant to his investigation. That testimony included two categories of admissible evidence: fact testimony from a forensic investigator about the steps he took at the crime scene, and testimony rationally based on the witness's perception and helpful to the trier of fact. To the extent that the Appellate Division found those portions of Campanella's testimony to violate N.J.R.E. 701, the Court disagrees. (pp. 21-23)

2

3.  Campanella also testified, however, that the "white blip" on the video indicated "the defendant firing the handgun"; that a frame depicted the suspect "turning towards the officer"; that another view of the first muzzle flash showed "where the suspect has turned and discharged the first round"; and that the video showed "where [the suspect] was standing when he fired the round."  Instead of commenting that the surveillance video showed the discharge of a weapon at a particular location, which would have constituted proper narration, Campanella testified about his view of defendant's actions.  Those comments, which supported the State's position as to sharply disputed facts, do not constitute either proper fact testimony or admissible lay opinion testimony, and it was error to admit them.  (pp. 23-24)

4.  The Court finds that error harmless, however.  First, defendant admitted he was both the person McGhee confronted and the person in the video.  Second, defendant made several key admissions that supported the State's theory that he shot at McGhee to avoid arrest.  Third, defendant admitted that his handgun discharged as he "turned to the side" and could "see McGhee out of my peripheral," demonstrating that he was aware of McGhee's proximity when the gun fired.  Fourth, McGhee testified that as defendant ran into the vacant lot, he turned 180 degrees, raised the handgun, and fired it at McGhee from a distance of 18 to 24 feet.  Fifth, the surveillance video shows McGhee approaching defendant, defendant running away with McGhee in close pursuit, defendant making a left turn near a building into a vacant lot, and a flash of light from defendant's location immediately after he turned.  Sixth, the State's expert witness on ballistics supported McGhee's version of events.  In light of the evidence, Campanella's improper comments that defendant turned toward the officer and that he "fired" and "discharged" the handgun were not "clearly capable of producing an unjust result" under Rule 2:10-2.  (pp. 24-28)

**AFFIRMED AS MODIFIED.**

**JUSTICE PIERRE-LOUIS, dissenting,** agrees with the majority's assessment of which portions of Campanella's testimony were admissible and which were inadmissible but does not agree that the error in allowing the inadmissible testimony was harmless.  Justice Pierre-Louis explains that the jury was tasked with resolving one question regarding the attempted murder charge -- whether defendant intentionally fired at Officer McGhee.  Noting that Campanella's opinion testimony, as the lead forensic detective in the case, invaded the province of the jury on the sole disputed issue, Justice Pierre-Louis concludes that the error in admitting that testimony was capable of producing an unjust result.

**JUSTICES SOLOMON and FASCIALE and JUDGE SABATINO (temporarily assigned) join in JUSTICE PATTERSON's opinion.  JUSTICE PIERRE-LOUIS filed a dissent, in which CHIEF JUSTICE RABNER and JUSTICE WAINER APTER join.**

3

State of New Jersey,

Plaintiff-Respondent,

v.

Dante C. Allen,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
| --- | --- |
| January 17, 2023 | August 2, 2023 |

Margaret McLane, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora, Public
Defender, attorney; Margaret McLane, of counsel and on
the briefs, and Glenn D. Kassman, Designated Counsel,
on the briefs).

Alecia Woodard, Special Deputy Attorney
General/Acting Assistant Prosecutor, argued the cause for
respondent (Raymond S. Santiago, Monmouth County
Prosecutor, attorney; Alecia Woodard, of counsel and on
the briefs, and Monica do Outeiro, Special Deputy
Attorney General/Acting Assistant Prosecutor, on the
briefs).

Alexander Shalom argued the cause for amicus curiae
American Civil Liberties Union of New Jersey (American
Civil Liberties Union of New Jersey Foundation,

attorneys; Alexander Shalom and Jeanne LoCicero, on the brief).

Raymond Brown argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, on the brief).

Frank Muroski, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Matthew J. Platkin, Attorney General, attorney; Frank Muroski, of counsel and on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

Defendant Dante Allen appeals his conviction of first-degree attempted murder and other offenses arising from a shooting incident during his encounter with a police officer. It is undisputed that defendant ran from the officer, that the officer pursued him, and that a handgun held by defendant discharged during the pursuit. The State contends that defendant deliberately shot at the police officer. Defendant claims that the handgun fired accidentally as he was running and that the weapon was not aimed at the officer.

At defendant's trial, the trial court permitted the lead detective in the investigation, who was not at the scene of the shooting, to narrate the surveillance video of the incident in his testimony before the jury. Most of the detective's narration focused on his use of the video as he investigated the crime scene. In several comments, however, the detective opined that the

2

video showed defendant turning toward the officer and firing his handgun, thus suggesting that defendant intentionally fired his weapon at the officer.

Following his conviction, defendant asserted on appeal that he was denied a fair trial because the trial court permitted the detective to present lay opinion testimony in violation of N.J.R.E. 701. The Appellate Division held that the detective's narration of the video exceeded the parameters of proper lay opinion testimony under N.J.R.E. 701 and that the trial court abused its discretion by permitting the narration. The appellate court concluded, however, that the trial court's error in admitting the contested comments was harmless, and it affirmed defendant's conviction. We granted defendant's petition for certification.

We disagree with the Appellate Division's conclusion that the trial court should have excluded all the detective's narration of the surveillance video. We hold that the trial court properly permitted the detective to testify about the manner in which he used the surveillance video to guide his investigation. Applying principles stated today in State v. Watson, ___ N.J. ___ (2023) (slip op. at 46-60), we concur with the Appellate Division that the detective's testimony opining that the video showed defendant turning and firing his weapon should have been excluded from evidence. We agree with the

3

appellate court, however, that the error was harmless given the strength of the State's evidence.

Accordingly, we affirm as modified the Appellate Division's judgment.

## I.

## A.

We summarize the facts based on the trial record.

At 7:15 p.m. on November 4, 2015, defendant was speaking with a friend on the sidewalk near the intersection of Atkins Avenue and Boston Way in Asbury Park. According to defendant's trial testimony, he was carrying a handgun that he had recently acquired after a confrontation with a gang member made him fear for his safety. Defendant testified that he had no permit for the weapon and that cocaine was concealed in his underwear.

Officer Terrence McGhee of the Asbury Park Police Department, patrolling the area in his police vehicle, saw defendant and the other man having what McGhee considered a "normal but animated" conversation. Defendant testified that he was nervous when he realized that the officer was watching him because he was aware that he was "not supposed to have this gun." McGhee testified that when defendant saw him, defendant's "mannerisms changed" and that defendant held his left arm "tight to his side," causing McGhee to suspect that defendant was carrying a weapon. McGhee

drove around the block, and defendant left his friend, walking north on Atkins Avenue toward his home.

At the intersection of Atkins Avenue and Springwood Avenue, McGhee pulled his patrol vehicle over and got out. McGhee and defendant both testified that McGhee then approached defendant and asked whether he could speak with him. McGhee and defendant provided conflicting accounts of what happened next.[1]

According to McGhee, defendant "stopped and turn[ed] right towards me and said yes, Officer, I have my I.D. right here." McGhee testified that in response, defendant "removed his wallet with his right hand," and "held it up above his head and away from his body, which appeared to be not normal or appeared to be a distraction." According to McGhee, defendant ignored his orders to show his hands, and instead "reach[ed] up underneath his sweatshirt . . . towards his waistband." The officer testified that he reached toward defendant's waistband and felt "the butt of the gun and then the top slide of the weapon," making him "a hundred percent" certain that defendant was carrying a gun.

---

[1] McGhee was not wearing a bodycam, so his conversation with defendant was not recorded.

McGhee stated that defendant, using his left hand, "slapped my hand down and proceeded running westbound," disregarding McGhee's repeated orders to stop. According to McGhee, as defendant ran into a vacant lot, he "turned 180 degrees, that would be counterclockwise, raised the handgun and fired at me" from a distance of eighteen to twenty-four feet.[2] McGhee stated that he saw the gun "go off" but was not hit by the bullet. McGhee testified that he fired his service weapon at defendant seven times, and "ultimately, I struck him and he fell." Defendant sustained a wound to his lower left leg.

McGhee testified that he used his radio to call for backup, stating that a suspect was down. He stated that defendant "was complaining about his leg," and that defendant said "officer, let me talk to you man-to-man. I f----d up." According to McGhee, he told defendant, "[d]on't f-----g move. I'll shoot you, m----r f----r." McGhee stated that he saw the gun within arm's reach under defendant's left arm, and that another officer who arrived on the scene recovered the weapon as McGhee secured defendant and rendered first aid.

---

[2] Although McGhee initially reported that the gun was in defendant's right hand, he testified at trial that defendant held the weapon in his left hand. Confronted with this discrepancy during defense counsel's cross-examination, McGhee stated that after he viewed surveillance video that was "zoomed in," he concluded that he "may have been mistaken and it could have been his left hand." McGhee explained that when he said that the video was "zoomed in," he meant "getting closer to the screen and having a closer look."

Defendant testified that, in response to McGhee's request to speak with him at the intersection of Atkins Avenue and Springwood Avenue, he provided the officer with his identification. According to defendant, when McGhee asked to see his hands, he did not reach for his weapon, but rather "attempted to put my hands up." Defendant stated that McGhee nevertheless "went straight for my waist," at which point he "[s]macked" McGhee's hand with his left hand. He stated that he ran toward the back of an abandoned building, "with my intent to throw the gun on the roof."

According to defendant, as he turned left and entered an unlit area near the building, pursued by McGhee, he "tr[ied] to throw the gun on the . . . roof, but as I turned to the side, I could see [McGhee] out of my peripheral. So next thing on my mind is to bring the gun back in, but it's too late, I wasn't able to, the gun goes off." He stated that he never pointed the gun at McGhee, but "grabbed it by the butt of the gun so that would make it easier for me to throw the gun." Defendant testified that "this all happened so fast, it happened very fast, and I was scared, I was running, adrenaline rushing." According to defendant, after his handgun went off, he "continued to run . . . a little bit" before falling to the ground due to his leg wound.

Defendant was arrested and taken to a hospital. In a search of defendant's clothing, officers discovered the cocaine concealed in his underwear.

Shortly thereafter, Detective Michael Campanella, the detective on call in his unit of the Monmouth County Prosecutor's Office, was notified of a shooting incident in Asbury Park that required crime scene processing, and he immediately went to the scene. Campanella was assigned to be the lead forensic detective on the case.

Campanella stated that he examined the handgun taken from defendant but found no fingerprints on it. He also examined the bullets found in the handgun, three of which were determined to be hollow-point bullets, as well as seven cartridges discharged by McGhee's service weapon.

Campanella reviewed two surveillance videos without audio, each recorded by a camera on a nearby building, and used the videos to locate areas of interest for his processing of the crime scene. He testified that a shell casing was recovered near the location where defendant stood when his handgun discharged but that the bullet discharged by that handgun was never found.

B.

A grand jury indicted defendant for first-degree attempted murder, second-degree unlawful possession of a weapon, second-degree possession of a weapon for an unlawful purpose, fourth-degree possession of a prohibited weapon, and third-degree possession of a controlled dangerous substance. A third-degree receiving stolen property charge was dismissed prior to trial.

Defendant was tried before a jury in a six-day trial. Before the jury, McGhee recounted his observations of defendant prior to the stop, his suspicion that defendant was carrying a weapon, his brief conversation with defendant, his pursuit of defendant into the vacant lot, and the exchange of gunfire. With no objection from defendant, McGhee narrated the videos as they were played for the jury, identifying the first flash of light in the video as "a muzzle flash from Dante's handgun, from firing at me," and the second flash of light in the video as "me, returning fire to defend myself."

After presenting the testimony of two other officers who responded to the scene and recovered defendant's handgun, the State called Campanella to the stand. He described his role as the lead forensic detective assigned to investigate the shooting, discussed his initial steps in processing the crime scene, and explained how officers had obtained the two surveillance videos.

9

After the State indicated its intent to replay the surveillance videos that the jury had already viewed during McGhee's testimony, defense counsel objected, stating that "there's nothing [Campanella] could tell us about it because he didn't observe it." The State countered that Campanella would explain "how the steps that [McGhee] and defendant took would have led him [to find] evidence, such as the shell casings and the bullets." Neither party requested a hearing pursuant to N.J.R.E. 104.

The trial court ruled that the proposed testimony "informs the route that [Campanella] took and where he did his investigation," and overruled the objection. Defense counsel did not further object to Campanella's testimony about the video. Neither counsel nor the trial court identified N.J.R.E. 701 as a rule of evidence governing the admission of Campanella's testimony.

As the videos were replayed, the prosecutor asked Campanella to explain to the jury how the videos informed his investigative strategy at the crime scene. Responding to that inquiry, Campanella discussed specific portions of the video, making the remarks that are the focus of this appeal:

> Okay, so at this point, this is at 56.16 seconds, this is where my interests gets piqued because the foot pursuit is still going on, however, I see the first muzzle flash, which is this white blip that you're seeing right here. That's the defendant firing the handgun. That tells me that from this position here, giving reference to this building, I'm hopefully going to find an ejected shell

10

casing somewhere in this proximity, let's say roughly 21 feet for argument sake.

. . . .

So here the suspect is turning towards the officer. You can't see yet, the officer is off camera from this angle, still pursuing. . . . Again, I can see the suspect is still running, but turning, turning to his left.

. . . .

Here, now you see the first muzzle flash you'd seen from the previous camera angle. This is where the suspect has turned and has discharged the first round.

. . . .

Reviewing the video we know where he was standing when he fired the round, so we're able to focus our attention in this direction.

[(emphases added).]

On cross-examination, Campanella confirmed that he was not an eyewitness to the incident and that his testimony was based on his review of the surveillance videos and certain assumptions, not on personal knowledge.

The State also presented the testimony of Randolph Toth, an investigator at the State Police Laboratory Ballistics Unit. The trial court qualified Toth as an expert in firearms toolmark identification, firearms operation, and ballistics comparison. Toth testified that the weapon retrieved from defendant was a 9

11

millimeter Smith & Wesson semiautomatic handgun, operable and capable of being discharged. He explained the testing that he conducted on the handgun retrieved from defendant. Toth opined that because the firing pin block in the handgun was functional, the weapon had not discharged accidentally the night of the incident, and that it was necessary to apply nine-and-three-quarters pounds of force to pull the handgun's trigger.

Defendant testified on his own behalf. He explained how and why he purchased the handgun and described his encounter with McGhee on November 4, 2015. Defendant stated that he knew that McGhee was the only officer present at the time of the incident. He denied that he had shot at McGhee or had any intent to injure the officer. He maintained that the gun discharged accidentally.

The jury was charged and began its deliberations. After requesting playbacks of the surveillance videos and viewing those videos, the jury reached its verdict. It convicted defendant of the attempted murder, unlawful possession of a weapon, and possession of a controlled dangerous substance charges and acquitted him of the possession of a weapon for an unlawful purpose and possession of a prohibited weapon charges. The trial court sentenced defendant to eighteen years' imprisonment subject to the No Early

Release Act, N.J.S.A. 2C:43-7.2, for attempted murder and to concurrent terms for the other offenses.

## C.

Defendant appealed his conviction and sentence, contending that by permitting Campanella to narrate the surveillance video, the trial court denied him a fair trial.[3] The Appellate Division agreed with defendant that the trial court had abused its discretion when it permitted Campanella to narrate the surveillance video. The appellate court held, however, that Campanella's remarks could not have led the jury to a verdict it might otherwise not have reached, considering defendant's admissions, McGhee's first-hand account of his encounter with defendant, and Toth's expert testimony. The court accordingly affirmed defendant's conviction and sentence.

## D.

We granted defendant's petition for certification. 251 N.J. 33 (2022). We also granted the applications of the American Civil Liberties Union of New Jersey (ACLU), the Association of Criminal Defense Lawyers of New Jersey (ACDL), and the Attorney General to participate as amici curiae.

---

[3] Before the Appellate Division, defendant also challenged the denial of his motion to suppress and his sentence. Those issues are not raised in this appeal.

## II.

### A.

Defendant contends that the trial court should have barred Campanella from testifying that defendant turned and fired his handgun. He argues that the testimony did not meet N.J.R.E. 701's requirements that lay opinion testimony be rationally based on the witness's perception and that it will assist the jury, and he claims that the testimony invaded the jury's province. Defendant asserts that the trial court's error was not harmless and requires that his conviction be reversed.

### B.

The State argues that the trial court properly admitted Campanella's testimony about the encounter between defendant and McGhee as lay opinion testimony under N.J.R.E. 701. It asserts that even if the admission of Campanella's testimony constituted error, the Court should find that error to be harmless in light of defendant's admissions, the corroborating testimony of McGhee and other officers, and Toth's expert opinion.

### C.

Amicus curiae ACLU urges us to require that any video narration by a police officer pursuant to N.J.R.E. 701 be based on the officer's personal observations or experience separate from the video itself, and to bar such

narration unless the court holds a hearing under N.J.R.E. 104 and issues a special instruction to the jury.

## D.

Amicus curiae ACDL proposes that the Court mandate both a hearing pursuant to N.J.R.E. 104 and a special jury instruction addressing law enforcement narration of videos at trial.

## E.

Amicus curiae the Attorney General contends that a police officer's review of a video satisfies N.J.R.E. 701's requirement that a lay witness testify based on his perception, and that any error in the admission of Campanella's testimony was harmless.

## III.

## A.

We review the trial court's evidentiary ruling for abuse of discretion. State v. Garcia, 245 N.J. 412, 430 (2021). We do not substitute our judgment for that of the trial court "unless the evidentiary ruling is 'so wide of the mark' that it constitutes 'a clear error in judgment.'" Ibid. (quoting State v. Medina, 242 N.J. 397, 412 (2020)).

B.

The admission of lay opinion testimony is governed by N.J.R.E. 701. The Rule provides that "[i]f a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it: (a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701 is modeled after Fed. R. Evid. 701. Sup. Ct. Comm. Cmt. on N.J.R.E. 701 (1991), reprinted in Biunno et al., Current N.J. Rules of Evidence 749 (2023).

Rule 701 imposes two requirements. First, the lay witness's opinion testimony must be based on the witness's "perception," which "rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." State v. McLean, 205 N.J. 438, 457 (2011); accord State v. Singh, 245 N.J. 1, 14 (2021). In contrast to expert opinion admitted pursuant to N.J.R.E. 702, "lay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." McLean, 205 N.J. at 460; accord State v. Sanchez, 247 N.J. 450, 467 (2021). The Rule imposes "the familiar requirement of first-hand knowledge or observation." Notes of Advisory Committee on Proposed Rules, Note to Fed. R. Evid. 701 (1975).

Second, N.J.R.E. 701 requires "that lay witness opinion testimony be limited to testimony that will assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." State v. Higgs, 253 N.J. 333, 363 (2023) (internal quotation marks omitted) (quoting Singh, 245 N.J. at 15). As we have observed, N.J.R.E. 701 "does not permit a witness to offer a lay opinion on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as he to form a conclusion.'" McLean, 205 N.J. at 459 (alteration and omission in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)).

In several recent decisions, we applied N.J.R.E. 701's "perception" prong to an officer's testimony identifying the defendant as the individual depicted in a photograph or video relating to the offense. In State v. Lazo, we excluded the opinion testimony of a law enforcement officer unacquainted with a defendant who stated that he included a photo of the defendant in a photo array "[b]ecause of his similarities to the suspects that were described by the victim." 209 N.J. 9, 19 (2012) (alteration in original). We held that "[n]either a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province." Id. at 24.

17

In State v. Singh, however, we affirmed the admission of an arresting officer's lay opinion that the sneakers worn by the suspect in surveillance video looked similar to sneakers worn by the defendant at the time of his arrest, given the officer's direct observation of the defendant's sneakers. 245 N.J. at 17-18. We held in Singh that the officer's reference to the suspect in the video as "the defendant" was improper in light of the dispute about the identity of the suspect, but that the reference was "fleeting" and did not amount to plain error. Ibid.

In Sanchez, we reversed the trial court's exclusion of the defendant's parole officer's identification of the defendant in a photograph taken from surveillance video, given the parole officer's many in-person meetings with the defendant and the capacity of her identification testimony to assist the jury. 247 N.J. at 469-75. There, the parole officer's identification derived from her personal perception, which enabled her to identify the defendant in the surveillance photograph "more accurately than a jury could." Id. at 474.

This appeal involves a different category of police officer lay opinion: narration of a video by an investigating officer who was not present at the time of an incident captured in that video.

In Higgs, we barred the lay opinion of a law enforcement officer who was not present at a shooting and testified that an object depicted in a

18

surveillance video appeared to be a firearm.  253 N.J. at 365-67.  Applying

N.J.R.E. 701's "perception" prong, we noted that the detective "had no prior

interaction or familiarity with either defendant or the firearm in question" and

that "[h]is testimony was based entirely on his lay opinion from watching the

video."  Id. at 365.  We reasoned that "[t]he video was in evidence and the jury

should have been permitted to view it slowly, frame by frame, to determine for

themselves what they saw on screen, without the influence of opinion

testimony by an officer who was not there at the time."  Id. at 367.  We held

that the officer's testimony had invaded the jury's province.  Id. at 366-67.

We did not, however, "rule out the possibility of allowing a law enforcement

officer to testify about a sequence in a video that is complex or particularly

difficult to perceive."  Id. at 367.

In State v. Watson, decided today, we addressed the admissibility of a

police officer's narration of a video of a bank robbery at which the officer was

not present, and held that the narration exceeded the bounds of proper lay

opinion testimony under N.J.R.E. 701 and N.J.R.E. 602 when the officer

provided commentary about the suspect's actions during the robbery.  Watson,

___N.J. ___ (2023) (slip op. at 57-60).  We disapproved of portions of the

officer's narration testimony that reflected his subjective belief of what

occurred in the surveillance video, including observations about alleged efforts

19

by the suspect not to touch surfaces during the robbery and a comment that "the suspect was very careful in . . . not attempting to leave any type of evidence behind." Id. at ____ (slip op. at 58-59).

We reiterated in Watson that under the framework prescribed by N.J.R.E. 701, N.J.R.E. 602, and N.J.R.E. 403, a witness narrating a video that depicts events that the witness did not observe in real time "may not provide opinions or comment on reasonably disputed facts." Id. at ____ (slip op. at 49); see also id. at ___ (slip op. at 51) (quoting N.J.R.E. 403, which guards against "[u]ndue prejudice, confusion of issues, . . . misleading the jury, . . . [and] needless presentation of cumulative evidence"). We held, however, that in appropriate circumstances, the testimony of a witness who was not present when a video was recorded may satisfy N.J.R.E. 701's and N.J.R.E. 602's "perception" and N.J.R.E.'s 701's "helpfulness" prongs. Id. at ___ (slip op. at 49-56).

To illustrate the practical application of those rules, we invoked settings in which "narration testimony can help jurors better understand video evidence and aid them in 'determining a fact in issue,'" including the presentation of video evidence that is confusing, lengthy, or unclear. Id. at ___ (slip op. at 49-51) (quoting N.J.R.E. 701(b)). We disapproved of the presentation of "continuous commentary during a video by an investigator whose knowledge

20

is based only on viewing the recording"; an investigator's "subjective interpretations" of what appears on a video; an investigator's testimony about personal views on "factual issues that are reasonably disputed"; and an investigator's observations "on what is depicted in a video based on inferences or deductions, including any drawn from other evidence." Id. at ___ (slip op. at 53-54).

We also identified procedural safeguards to ensure that narration testimony does not undermine the fairness of the trial, including notice to the other party before trial, the use of in limine motions so that the court can determine any issues about the scope of the testimony left unresolved by counsel, and the court's authority to conduct N.J.R.E. 104 hearings to address any outstanding issues. Id. at ___ (slip op. at 55-56).

## C.

Guided by those principles, we consider Campanella's narration of the surveillance videos at defendant's trial.

To convict defendant of attempted murder, the State had the burden to prove beyond a reasonable doubt that he intended to cause McGhee's death. N.J.S.A. 2C:5-1; N.J.S.A. 2C:11-3; see also State v. Reddish, 181 N.J. 553, 627 (2004) (noting that a defendant "is guilty of attempted murder only if he or she actually intended the result, namely, death, to occur" (quoting State v.

21

Rhett, 127 N.J. 3, 7 (1992))).  It was the jury's province to decide whether defendant had purposely fired his gun at McGhee, as the State contends, or was attempting to dispose of the gun when it accidentally discharged, as he asserts.

Most of Campanella's testimony regarding the surveillance video pertained to the role of the video in the investigation of the crime scene.  He explained how he used the video to identify areas that he considered likely to contain evidence relevant to his investigation.  Campanella stated, for example, that he did not expect to find significant evidence in the immediate vicinity of the initial encounter between defendant and McGhee -- an area in which no weapon discharged -- but that he nonetheless checked that area in case an item was dropped there.  The detective stated that in his search for cartridges and other ballistic evidence, he focused on locations in which the surveillance video captured muzzle flashes.  He reasoned that he would expect to find ballistic evidence to the right of each weapon when it discharged, because semi-automatic weapons eject cartridges in that direction. Campanella testified that areas in which McGhee and the suspect were located prior to their exchange of gunfire were less likely to yield evidence.

Campanella's explanation of the manner in which the surveillance video informed his processing of the crime scene did not invade the jury's province.

22

That testimony included two categories of admissible evidence: fact testimony from a forensic investigator about the steps he took at the crime scene, and testimony rationally based on the witness's perception and helpful to the trier of fact. See N.J.R.E. 701; Watson, ___ N.J. at ___ (slip op. at 52-56); Singh, 245 N.J. at 14-15; McLean, 205 N.J. at 456-57. To the extent that the Appellate Division found those portions of Campanella's testimony to violate N.J.R.E. 701, we disagree.

Campanella also testified, however, that the "white blip" on the video indicated "the defendant firing the handgun"; that a particular frame depicted the suspect "turning towards the officer"; that another view of the first muzzle flash showed "where the suspect has turned and discharged the first round"; and that the video showed "where [the suspect] was standing when he fired the round." Instead of commenting on the fact that the surveillance video showed the discharge of a weapon at a particular location, which would have constituted proper narration, Campanella testified about his view of defendant's actions.

Campanella's comments about what transpired during the encounter between McGhee and defendant do not constitute either proper fact testimony or admissible lay opinion testimony. In contrast to McGhee, who offered a first-hand account of the shooting, Campanella was not present on the scene

23

and had no personal knowledge of the incident.  Nonetheless, he testified in support of the State's position as to sharply disputed facts.  His comments about defendant's actions were improper.  See Watson, ___ N.J. at ___ (slip op. at 53) ("[I]nvestigators may not offer their views on factual issues that are reasonably disputed.").

We therefore concur with the Appellate Division that the trial court erred when it admitted those comments into evidence.  See ibid.

IV.

We next decide whether the admission of Campanella's remarks about what he viewed to be defendant's actions on the surveillance video constituted harmless error.

A.

In assessing whether an error is harmless or requires reversal, we "determine whether the error was 'of such a nature as to have been clearly capable of producing an unjust result.'"  State v. Trinidad, 241 N.J. 425, 451 (2020) (quoting R. 2:10-2).

"The term 'clearly capable of producing an unjust result' has been variously defined in the case law, but is generally considered to mean that the error was of a nature sufficient 'to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'"  Mandel,

24

N.J. Appellate Practice § 34:3-2 (2023) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).  As we have observed, "no trial can ever be entirely free of even the smallest defect," but our goal "must always be fairness.  'A defendant is entitled to a fair trial but not a perfect one.'"  State v. R.B., 183 N.J. 308, 333-34 (2005) (quoting Lutwak v. United States, 344 U.S. 604, 619 (1953)).

When we consider whether a given error is harmless, that error "must be evaluated in light of the overall strength of the State's case."  State v. Galicia, 210 N.J. 364, 388 (2012) (internal quotation marks omitted) (quoting State v. Walker, 203 N.J. 73, 90 (2010)); accord Trinidad, 241 N.J. at 451; State v. Sanchez-Medina, 231 N.J. 452, 468 (2018).  Thus, in appeals involving the erroneous admission of improper police officer lay testimony, the nature and extent of the admitted testimony is balanced against the strength of the prosecution's case beyond that testimony in determining whether the court's error requires a new trial.  In State v. Derry, for example, we held that a police officer's interpretations of slang terms in intercepted conversations should not have been admitted as lay opinion, but relied "on the overwhelming evidence against defendants to conclude that the error in admitting [the agent's] testimony as lay opinion testimony [(as opposed to expert testimony)] was harmless."  250 N.J. 611, 634 (2022).  And in Singh, we held that the testifying detective "should not have referenced defendant in his summary of

25

the surveillance footage," but that his two brief references to the suspect as "defendant" were not clearly capable of producing an unfair result under Rule 2:10-2, given the strong evidence of the defendant's guilt. 245 N.J. at 5, 18.

B.

Viewing the record as a whole, the evidence of defendant's guilt was compelling.

First, defendant admitted that he was the person whom McGhee confronted at the intersection of Atkins Avenue and Springwood Avenue in Asbury Park on November 4, 2015, and that he was the person depicted with McGhee in the surveillance video admitted into evidence. This left no doubt as to the identity of the alleged perpetrator.

Second, defendant made several key admissions that supported the State's theory that he shot at McGhee in an attempt to avoid being arrested. He admitted that was carrying a loaded semiautomatic handgun in his waistband, that he had no permit to possess the weapon, that he had concealed cocaine in his underwear, and that he was aware that McGhee was the only police officer on the scene at the time of the incident. The testimony of McGhee and other officers corroborated those admissions. In addition, defendant testified on direct examination that he had his finger on the trigger

26

of the handgun when it discharged, and stated on cross-examination that he did not recall having his finger on the trigger, "but obviously it was."

Third, defendant admitted that his handgun discharged as he "turned to the side" and could "see McGhee out of my peripheral." That concession demonstrates that defendant was aware of McGhee's proximity when the gun fired.

Fourth, McGhee testified that as defendant ran into the vacant lot, he turned 180 degrees, raised the handgun, and fired it at McGhee from a distance of eighteen to twenty-four feet.

Fifth, although the surveillance video presented to the jury by no means establishes that defendant intentionally shot at McGhee, it shows McGhee approaching defendant, defendant running away with McGhee in close pursuit, defendant making a left turn near a building into a vacant lot, and a flash of light emanating from defendant's location immediately after he turned.

Sixth, the State's expert witness on ballistics, Toth, supported McGhee's version of events and contradicted defendant's account of what occurred. Toth opined that the force required to discharge defendant's handgun was nine and three quarters pounds, and that the gun would not discharge unless the trigger was pulled "completely through." The expert testified that he conducted a series of twenty-four test drops of the weapon from a height of four feet to

27

determine whether it was capable of discharging accidentally. He stated that the handgun never discharged during any of the test drops. The expert opined that the results of his testing were consistent with his finding that the firing block pin in the handgun was functional and would not allow the firearm to discharge unless the operator of the handgun pulled the trigger. Hence, the State, through unrebutted expert testimony, countered defendant's claim of an accidental discharge.

In short, there was powerful evidence that as defendant turned left into the vacant lot, he turned in McGhee's direction and fired his weapon, and that the handgun did not accidentally discharge, but was intentionally fired. Campanella's improper comments that defendant turned toward the officer and that he "fired" and "discharged" the handgun were not sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached, and were not "clearly capable of producing an unjust result" under Rule 2:10-2.

Accordingly, we hold that the trial court's error was harmless, and the Appellate Division properly affirmed defendant's conviction.

V.

The judgment of the Appellate Division is affirmed as modified.

28

JUSTICES SOLOMON and FASCIALE and JUDGE SABATINO (temporarily assigned) join in JUSTICE PATTERSON's opinion.  JUSTICE PIERRE-LOUIS filed a dissent, in which CHIEF JUSTICE RABNER and JUSTICE WAINER APTER join.

State of New Jersey,

Plaintiff-Respondent,

v.

Dante C. Allen,

Defendant-Appellant.

JUSTICE PIERRE-LOUIS, dissenting.

Today, the majority holds, and I agree, that a detective's video narration testimony -- specifically, his lay opinion about what the video showed regarding the sole issue determinative of defendant's guilt on the most serious charge -- was impermissible under the rules of evidence and our holding in State v. Watson, ___ N.J. ___ (2023).  The majority, however, finds that the error was harmless and affirms defendant's conviction.

Because I believe that the error was capable of producing an unjust result, I respectfully dissent.

I.

In recent years, this Court has addressed the admission of lay opinion testimony by law enforcement officers in a variety of contexts, including the identification of defendants in videos or photographs.  In State v. Lazo, we ruled that it was improper for a non-eyewitness detective to testify that a photo

of the defendant resembled a composite sketch of the suspect because the detective did not have personal familiarity with the defendant's appearance before rendering such an opinion. 209 N.J. 9, 22-24 (2012). In State v. Singh, the trial court allowed a detective to testify that the sneakers seen in video surveillance footage were similar to those he personally observed the defendant wearing at the time of arrest. 245 N.J. 1, 4-5 (2021). The video, as well as the sneakers, were in evidence and available to the jury. Id. at 19-20. Under those circumstances, the Court held that because the detective "had first-hand knowledge of what the sneakers looked like, having seen them on [the] defendant" when he was apprehended, the detective's "lay witness opinion as to the similarities between the sneakers from the surveillance footage and the sneakers he saw that night was rationally based on his perception." Id. at 19-20.

In State v. Sanchez, the trial court barred the defendant's parole officer from offering a lay opinion identifying the defendant in a still photograph from a surveillance video. 247 N.J. 450, 458 (2021). The parole officer had met with the defendant more than 30 times in the 15 months prior to seeing the "Attempt to Locate" flyer in which she identified the defendant. Id. at 458, 460-61. This Court reversed, finding that the parole officer's "identification of [the] defendant as the front-seat passenger in the surveillance photograph was

2

'rationally based on [her] perception,' as N.J.R.E. 701 requires," because the officer was "familiar with [the] defendant's appearance." Id. at 469 (second alteration in original). And recently, in State v. Higgs, we held that it was improper for an officer who was not at the scene of the crime to testify to an image in a video that was the subject of disputed testimony. 253 N.J. 333, 366-67 (2023). We held that the detective's "testimony invaded the province of the jury by usurping the jury's assessment of the image in the video." Id. at 366.

Today, our holding in Watson is the culmination of those previous cases over the past decade in which this Court has wrestled with the parameters of video narration testimony. Watson sets forth significant guardrails and constraints on testimony involving video images and the procedure by which such testimony should be assessed pretrial. ___ N.J. at ___ (slip op. at 52-56). We held that officers can testify to basic, neutral background information, such as the location of the video, the viewing angle, the duration of the video, and whether the clip is a composite of multiple videos to aid the jury in understanding what they are watching. Id. at ___ (slip op. at 57-58). Although "investigators can describe what appears on a recording," they "may not offer opinions about the content." Id. at ___ (slip op. at 53). We made clear that law enforcement officers should not provide "continuous

3

commentary during a video" if the witness testimony is "based only on viewing the recording." Id. at ___ (slip op. at 52). And importantly, under Watson, a witness without personal knowledge of the underlying events cannot comment on "factual issues that are reasonably disputed." Id. at ___ (slip op. at 53). In other words, so long as there is a "good faith" dispute about the evidence shown on a video, the witness is not permitted to put their thumb on the scale and provide their subjective analysis of what they believe the evidence shows. Id. at ___ (slip op. at 52).

## II.

In the present case, Officer McGhee and defendant Dante Allen offered two different versions of what transpired on the evening of November 4, 2015. Officer McGhee testified that as he pursued defendant, defendant turned 180 degrees as he ran, raised a handgun, and fired a shot directly at Officer McGhee. Defendant admitted to being in possession of the gun but claimed that the gun went off accidentally. Defendant testified that while he was running, he realized he needed to get rid of the handgun and decided to toss it onto the roof of a nearby building. But according to defendant, at the last second, he pulled the gun back in, causing it to fire accidentally. Officer McGhee was not hit by the bullet. Officer McGhee fired his weapon at defendant and struck him in the leg. Officer McGhee testified that when he

4

approached defendant, who was lying on the ground after having been shot, defendant asked to speak to the officer "man-to-man" and said he "f***ed up." Defendant testified that when Officer McGhee approached him, he apologized and tried to tell the officer that "it was an accident."

Defendant was charged with numerous offenses, the most serious of which was attempted murder of Officer McGhee. Given the evidence presented to the jury, the conflicting accounts from Officer McGhee and defendant, and defendant's defense that the shooting was an accident, the jury was tasked with resolving one question regarding the attempted murder charge -- whether defendant <u>intentionally</u> fired the gun at Officer McGhee. Officer McGhee gave his version and defendant gave his. The task was for the jury alone to decide who they believed.

Detective Campanella testified as well. He was not on scene when the shooting occurred and based his testimony solely on watching video footage. His testimony improperly presented the jury with a third perspective regarding whether defendant intentionally fired the weapon.

I agree with the majority that Detective Campanella's initial testimony regarding his process for gathering evidence at the crime scene was not improper. <u>Ante</u> at ___ (slip op. at 21-22). But, as the majority held, Detective Campanella's testimony "about what transpired during the encounter between

5

McGhee and defendant [did] not constitute either proper fact testimony or admissible lay opinion testimony." Ante at ___ (slip op. at 23).

While narrating the video, Detective Campanella testified to the following in support of Officer McGhee's version of events: "[t]hat's the defendant firing the handgun"; "[s]o here the suspect is turning towards the officer"; "I can see the suspect is still running, but turning, turning to his left"; "[t]his is where the suspect has turned and has discharged the first round." With those statements, Detective Campanella put his thumb on the scale of the exact issue the jury was considering -- whether defendant intentionally turned toward Officer McGhee and fired the weapon.

It is important to note that the video was dark and grainy, and that the events transpiring were not easy to discern. Officer McGhee, who was present and involved in the incident, had already testified and appropriately narrated the video based on his personal knowledge from being at the scene. With Detective Campanella telling the jury that defendant "turn[ed] towards the officer" and "fir[ed] the handgun," his testimony essentially vouched for Officer McGhee's version of events. The video was in evidence and the jury was capable of watching it "to determine for themselves what they saw on screen, without the influence of opinion testimony by an officer who was not there at the time." Higgs, 253 N.J. at 367; see also State v. Frisby, 174 N.J.

6

583, 595-96 (2002) (noting that when a case comes down to the credibility of two competing witnesses, "[a]ny improper influence on the jury that could have tipped the credibility scale was necessarily harmful and warrants reversal").

The majority asserts that there was strong evidence that defendant intentionally fired at Officer McGhee, including the officer's testimony and the expert testimony from Detective Randolph Toth that the type of gun in defendant's possession cannot accidentally discharge. Ante at ___ (slip op. at 25-28). I do not believe the evidence was overwhelming. The bottom line is that Detective Campanella's opinion testimony, as the lead forensic detective in the case, invaded the province of the jury on the sole disputed issue in the case and was "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Trinidad, 241 N.J. 425, 445 (2020) (quoting State v. Macon, 57 N.J. 325, 336 (1971)).

Today, this Court issued an important decision in Watson that sets forth guidelines for the admission, or not, of an entire category of evidence that has been the subject of numerous matters before this Court. In issuing such opinions, the message to the bench and bar should be that there will be real consequences when trial errors occur that are capable of producing an unjust result.

7

As every member of this Court agrees, Detective Campanella's testimony should not have been admitted. His testimony was a textbook example of exactly the type of video narration lay opinion testimony that is not permitted pursuant to the rules of evidence and Watson. Nevertheless, in the first case to apply the dictates of Watson, the Court finds the error harmless.

There will, of course, be cases in which errors are harmless because the error does not touch upon a significant issue in the case. See State v. Hedgespeth, 249 N.J. 234, 251-52 (2021) (explaining that a rule that classifies "any erroneous evidentiary ruling" as structural error "would lead to untenable results"). This is not such a case.

I believe the error was harmful. To find otherwise not only diminishes the public's confidence in the criminal justice system, but also weakens the strong protections put in place by the rules of evidence and Watson to ensure testimony is properly admitted, or excluded, at trial.

For those reasons, I respectfully dissent.